IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MELISSA KARABIN, *et al.*

          Plaintiffs,

    v.

NORWIN SCHOOL DISTRICT,
ALEXANDER DETSCHELT,

          Defendants.

2:24-CV-00769-CCW

## OPINION

Before the Court are Defendants Norwin School District (the "District") and Alexander Detschelt's Motions to Dismiss Plaintiffs Melissa Karabin, Matthew Karabin, Samantha Karabin, and J.K.'s[1] Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 19, 27. For the reasons set forth below, the Court will grant in part and deny in part the Motions.

## I.    Background

The relevant factual allegations in the Complaint, taken as true, are as follows.[2]

The Karabins are residents of North Huntingdon Township in Westmoreland County, Pennsylvania. ECF No. 2 ¶¶ 9–11. Melissa (Ms. Karabin) and Matthew (Mr. Karabin) are the parents of Samantha and J.K. *Id.* At all relevant times, Samantha and J.K. were high school students within the District. *Id.* The District is a K-12 educational institution that receives federal funding and is required to comply with Title II of the Americans with Disabilities Act ("ADA")

---

[1] J.K. is a minor and is proceeding pseudonymously.

[2] The factual allegations in the Complaint are lengthy and span approximately four years. For brevity and because events occurring prior to May 23, 2022 are outside the relevant statute of limitations, the Court's recitation focuses on events after that date, unless earlier events are relevant or provide necessary context.

and Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act").  *Id.* ¶¶ 1, 13, 18–19.  Defendant Alexander Detschelt is a District "School Board School Director/Board Member."  *Id.* ¶ 12.

Around March of 2020, Ms. Karabin began experiencing health symptoms including fatigue, sinus and ear infections, head and body aches, anxiety, and depression.  *Id.* ¶ 21.  Beginning in January 2021, Ms. Karabin's health had deteriorated to the point that she was unable to work, and in March 2021, she was diagnosed with Myalgic Encephalomyelitis/Chronic Fatigue Syndrome ("ME/CFS").  *Id.* ¶¶ 31–33.  In December 2020, Samantha Karabin began experiencing symptoms similar to Ms. Karabin's.  *Id.* ¶ 26.  Samantha Karabin's symptoms had worsened by the time of Ms. Karabin's ME/CFS diagnosis, *id.* ¶ 34, and at some point in 2021 Samantha was diagnosed with "headaches, fatigue, stomach aches, dizziness, lightheadedness due to low iron and orthostatic intolerance/[Postural Tachycardia Syndrome]."  *Id.* ¶¶ 160–61.

In August 2021, the District adopted a new Health and Safety Plan for the 2021-2022 school year over Ms. Karabin's objections.  *Id.* ¶¶ 64–65.  The new plan removed the district-wide mask mandate that was implemented in response to the COVID-19 pandemic and established an entirely online curriculum—the Norwin Online Academy ("NOA")—for those students who would be unable to attend school in-person due to pre-existing conditions.  *Id.* ¶¶ 40–41, 48, 65.  Both Samantha and J.K. ultimately enrolled in the NOA.  *Id.* ¶¶ 82–83, 203–04.

On November 15, 2021, Ms. Karabin emailed the District requesting that a school board meeting[3] be held via Zoom so that she could attend because she was disabled and homebound and could not be there in person.  *Id.* ¶¶ 127.  Ms. Karabin wanted to attend that meeting to comment on proposed changes to the District's Health and Safety Plan.  *Id.* ¶ 129.  According to District

---

[3] The Complaint does not allege on what date this specific meeting was to be held.

board meeting notes, on January 17, 2022 Mr. Detschelt stated in a board meeting that "if community members wanted to speak at a meeting, then community members could attend in person." *Id.* ¶ 163. Another board member at the same meeting stated that "if community members could not attend physically, then they could send comments to the Board secretary." *Id.* ¶ 164. Ms. Karabin never heard back regarding her November 15, 2021 email requesting to appear at a school board meeting by Zoom.[4] *Id.* ¶ 168.

In January 2022, Ms. Karabin emailed Dr. Heather Newell, the District's Director of Curriculum and Assessment, requesting a plan for accommodations pursuant to Section 504 of the Rehabilitation Act for Samantha and J.K. "based on [Ms. Karabin's] health issues, [Samantha's and J.K.'s] genetic predisposition that makes them vulnerable to COVID and other viruses, and [Samantha's and J.K.'s] medical conditions." *Id.* ¶¶ 41, 169–173. On February 15, 2022, the District approved a Section 504 Agreement providing Samantha with certain accommodations, which did not include "masking in schools" (which Ms. Karabin had requested) because Samantha was enrolled in NOA. *Id.* ¶ 184–85, 192. Samantha's Section 504 Agreement did, however, require "maximum increased space and distance with the goal of six feet social distancing" for in-person events. *Id.* ¶ 230. While the District initially declined to approve a Section 504 Agreement for J.K.,[5] it implemented one on May 2, 2022 after being provided with a doctor's note stating that J.K. suffered from ME/CFS. *Id.* ¶¶ 193–202. In October 2022, J.K.'s Section 504 Agreement was

---

[4] The Complaint does not allege whether Ms. Karabin attended this particular board meeting.

[5] The District concluded that J.K.'s diagnosis of obesity and "family history of a genetic disorder that makes him more susceptible to complications from COVID-19" was insufficient to warrant a Section 504 Agreement. ECF No. 2 ¶¶ 193–95.

"modified and updated" after Ms. Karabin requested a number of additional accommodations.[6]
*Id.* ¶¶ 205–07.

On October 25, 2022, Ms. Karabin emailed unnamed District board members to alert them
that Mr. Detschelt had been "harassing, bullying and discriminating against me and my disability
online" in a public Facebook group. *Id.* ¶ 208. Among other things, Mr. Detschelt's statements
included that "[t]he only disability [Ms. Karabin has] shown to have is that of being an attention-
seeker." *Id.* ¶ 210. The next day, Mr. Detschelt responded to Ms. Karabin by email, referring to
his statements as his "greatest hits." *Id.* ¶ 212.

On February 26, 2023, Ms. Karabin emailed Kimberly Thorsen, Samantha's guidance
counselor, informing her that Ms. Karabin and Samantha planned to attend the high school's play
*Mean Girls* on March 25, 2023. *Id.* ¶ 223. In that same email, Ms. Karabin advised Ms. Thorsen
that Samantha and Ms. Karabin had purchased wheelchair-accessible tickets in the front row and
planned to wear masks, but still "needed space" due to their immunocompromised condition. *Id.*
¶¶ 224–28. Ms. Thorsen responded on March 1, 2023, informing Ms. Karabin that "the tickets
around their seats had already been purchased and therefore no social distancing was available
either to their sides or around them." *Id.* ¶ 229.

On March 3, 2023, Ms. Karabin, through counsel, emailed "the District" advising it that
she suffered from ME/CFS, "along with other well-documented medical diagnoses," and that these
conditions "substantially limited [her] various major life activities, including but not limited to
walking, standing, thinking, sleeping, and caring for herself." *Id.* ¶ 231. Ms. Karabin also advised
the District that her disabilities "caused her to be immunocompromised," and therefore Ms.

---

[6] The Complaint lists the accommodations that Ms. Karabin requested but does not describe which of them were
included in J.K.'s Section 504 plan. ECF No. 2 ¶ 205.

Karabin was "particularly susceptible to contracting illnesses and diseases when she attended a meeting or gathering in a public, physical space." *Id.* ¶¶ 232–33. Further, she informed the District that her disabilities rendered her "occasionally able to ambulate and leave her home with the assistance of a wheelchair," but "largely bedridden," and that "she was often unable to attend Board meetings held by the Norwin Area School District, despite her desire to do so." *Id.* ¶¶ 235–36. As such, in the same email Ms. Karabin requested to participate in the public comment segment of the March 13, 2023 District board meeting "through the use of a remote participation platform (e.g., Zoom, Google Meet, or Microsoft Teams) . . . so that she could benefit, speak, listen, participate fully, and make public comments just as she would otherwise be able to do were she not disabled and prevented from attending in person." *Id.* ¶¶ 237–39. Additionally, Ms. Karabin asked the District to reconsider her previous request for a social distancing accommodation for her and Samantha to attend *Mean Girls.* *Id.* ¶¶ 241–44.

On March 9, 2023, the District, through its counsel, responded to Ms. Karabin's March 3 email, advising her that she could provide, in advance of the March 13 meeting, any written comments she would like the Board to consider, to Superintendent Dr. Taylor. *Id.* ¶ 245. Dr. Taylor would then share that information with Board members before their meeting/vote. The District's March 9 response to Ms. Karabin's email also advised her that she could view and listen to a livestream of the meeting on YouTube, and that if she chose to attend the meeting in person, it could be held in the cafeteria where she would be able to distance herself from others. *Id.* ¶¶ 245–248.

On May 18 and 19, 2023, Ms. Karabin and then her counsel emailed the District to ask what accommodations would be provided so that she could safely attend Samantha's high school graduation ceremony, which was moved indoors. *Id.* ¶¶ 259–60. Ultimately, Ms. Karabin and the

District agreed on numerous accommodations for both her and Samantha with respect to Samantha's graduation ceremony. *Id.* ¶¶ 261–270.  One of the accommodations for Ms. Karabin included that she would be individually greeted by a District staff member at the handicap-accessible ramp at a specific door and time so that she could be escorted toward the auditorium using handicap-accessible elevators.  *Id.* at ¶ 261.  However, when Ms. Karabin asked for an accommodation to arrive late at her reserved entrance point "due to [her] disability-related fatigue," the District declined to make that additional accommodation because "no one would be available to greet the Karabins if Mrs. Karabin arrived later," and her reserved entrance would be locked if she arrived later. *Id.* ¶¶ 271–73.

On September 18, 2023, Ms. Karabin requested that "J.K. be evaluated to determine his eligibility for specially designed instruction through an Individualized Educational Program ('IEP')." *Id.* ¶ 275.  On December 11, 2023, the District issued a final Evaluation Report concluding that while J.K. had a disability, "he did not qualify for specially designed instruction, and therefore was ineligible for special education." *Id.* ¶¶ 279–80.  The Evaluation Report, however, "ignored J.K.'s known severe physical fatigue and related physical needs associated with his disability of ME/CFS." *Id.* ¶ 281.  The District had been informed of J.K.'s physical health needs both by the J.K.'s doctor and by Ms. Karabin. *Id.* ¶ 282–87.  According to an October 2022 letter from J.K.'s doctor which the District had in its possession, J.K.'s disability was characterized by "fatigue not improved by rest, problems sleeping, as well as pain and dizziness among other symptoms" such as impaired motor functioning. *Id.*  On February 14, 2024, Ms. Karabin emailed District Board members asserting that the Evaluation Report "did not take into consideration all of J.K.'s disability-related needs and symptoms," and requesting an independent evaluation to assess

J.K.'s needs for specially designed instruction. *Id.* ¶¶ 295–96.  Ms. Karabin withdrew that request approximately two weeks later. *Id.* ¶ 300.

Throughout this entire period, Ms. Karabin continued to notify the District that Mr. Detschelt was posting about her online.  For example, in March 2023, Ms. Karabin emailed several District board members and staff informing them of numerous comments that Mr. Detschelt continued to make about her on social media. *Id.* ¶¶ 250–51.  In May 2023, Ms. Karabin learned of additional comments that Mr. Detschelt had made on Facebook, including that Ms. Karabin "needed to call 911 for a 201 voluntary commitment and to admit to having Munchausen Syndrome."[7] *Id.* ¶ 252.

On May 22, 2024, the Karabins filed the instant case against the District and Mr. Detschelt, asserting various constitutional violations pursuant to 42 U.S.C. § 1983, violations of the ADA and Rehabilitation Act, and violations of Pennsylvania state law.  ECF No. 2.  The District and Mr. Detschelt have moved to dismiss the Complaint pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF Nos. 19, 27.  Defendants' Motions are fully briefed and thus ripe for resolution.  ECF Nos. 20, 26, 28, 29, 31.

## II.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a claim.  In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions.

---

[7] The Complaint contains numerous instances of specific statements made by Mr. Detschelt about Ms. Karabin. *See, e.g.,* ECF No. 2 ¶¶ 210(a)–(d), 251(a)–(j).  Rather than recite them all here, the Court will address them below, as necessary to resolve the instant Motions.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, "a formulaic recitation of the elements of a cause of action will not do." *Id.*  Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient . . . to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  (quoting *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  That said, under Rule 8's notice pleading standard, even after the Supreme Court's decisions in *Twombly* and *Iqbal*, a plaintiff need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connolly v. Lane Constr. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) (finding that "at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss").

## III. Legal Analysis

The Complaint includes the following twelve claims asserting violations of federal and state law:[8]

| Count | Cause of Action | Plaintiff(s) Asserting Claim(s) | Defendant(s) |
|---|---|---|---|
| Count I | Defamation – Pennsylvania Law | Melissa Karabin | Alexander Detschelt |
| Count II | 42. U.S.C. § 1983 – First Amendment Retaliation | Melissa Karabin | Alexander Detschelt; Norwin School District |
| Count III | Pennsylvania Constitution Art. I, § 7 – Free Speech Retaliation | Melissa Karabin | Alexander Detschelt; Norwin School District |
| Count IV | Rehabilitation Act – Disability Discrimination | J.K. | Norwin School District |
| Count V | ADA – Disability Discrimination | J.K. | Norwin School District |
| Count VI | Rehabilitation Act & ADA – Associational Discrimination | Melissa Karabin; Matthew Karabin; Samantha Karabin; J.K. | Norwin School District |
| Count VII | 42. U.S.C. § 1983 – Fourteenth Amendment (Parental Rights) | Melissa Karabin; Matthew Karabin | Norwin School District |
| Count VIII | 42. U.S.C. § 1983 – Failure to Train | Melissa Karabin; Matthew Karabin; Samantha Karabin; J.K. | Norwin School District |
| Count IX | Rehabilitation Act – Failure to Accommodate | Melissa Karabin | Norwin School District |
| Count X | ADA – Failure to Accommodate | Melissa Karabin | Norwin School District |
| Count XI | Rehabilitation Act – Retaliation | Melissa Karabin | Alexander Detschelt; Norwin School District |
| Count XII | ADA – Retaliation | Melissa Karabin | Alexander Detschelt; Norwin School District |

---

[8] The Court has federal question jurisdiction over the Section 1983 claims, the ADA Claims, and the Rehabilitation Act claims pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

Defendants have moved to dismiss all Counts for failure to state a claim.  *See* ECF Nos. 19, 27.  The Court will first address Defendants' argument that many of the claims asserted are barred by the applicable statutes of limitations, and will then turn to the merits of the claims

### A.    The Portions of Counts IV Through XII Based on Events That Took Place Prior to May 22, 2022 Are Untimely

As an initial attack on the Complaint, the Defendants argue that Counts IV through XII should be dismissed in whole or in part because they are based on events that occurred more than two years prior to the filing of the Complaint and are therefore barred by the applicable statutes of limitations.  ECF Nos. 20 at 4–6;  28 at 10–13.  The Karabins respond that the Complaint alleges specific violations within two years of the filing of the Complaint and therefore these Counts are not barred on statute of limitations grounds.  ECF Nos. 26 at 3–7;  31 at 14–15.

Counts IV through XII assert claims under 42 U.S.C. § 1983, the Rehabilitation Act, and the ADA.  ECF No. 2 ¶¶ 351–421.  The parties agree that these three statutes borrow their statute of limitations from the personal injury tort law of the state where the cause of action arose, and that in this case Pennsylvania law imposes a two-year statute of limitations.  *See* ECF Nos. 20 at 4;  26 at 3;  28 at 10–11;  *Nguyen v. Penn.*, 906 F.3d 271, 273 (3d Cir. 2018) (applying Pennsylvania's two-year statute of limitations to § 1983 claims);  *Disabled in Action of Penn. v. Se. Penn. Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008) (applying Pennsylvania's two-year statute of limitations to ADA and Rehabilitation Act claims).

Here, the original Complaint[9] was filed on May 23, 2024, so claims based on events that occurred prior to May 23, 2022 would be outside the two-year statute of limitations.  After reviewing the Complaint and the parties' briefing, the Court concludes that the Complaint

---

[9] The Karabins filed a corrected Complaint on May 24, 2024, because their original Complaint included J.K.'s full name.

sufficiently alleges specific events that occurred on or after May 23, 2022 such that dismissal of Counts IV through XII in their totality on statutes of limitations grounds would be improper. However, the Court agrees that to the extent Counts IV through XII assert claims based on events that occurred prior to May 23, 2022, such claims are time-barred and will be dismissed.  For example, claims based on the District's August 16, 2021, decision to remove District-wide mandatory masking polices, ECF No. 2 ¶¶ 64–65, are time-barred.  Similarly, any claims based on Samantha's Section 504 Agreement not containing a requirement for masking in schools are untimely, as the District denied that request in March 2022.  *Id.* ¶¶ 184–85, 192.  The Court therefore will only consider whether Counts IV through XII allege plausible claims based on events which occurred after May 23, 2022 and will dismiss the remaining portions of Counts IV through XII.

### B.    The Karabins' § 1983 Claims

Counts II, VII, and VIII assert constitutional claims pursuant to 42 U.S.C. § 1983.  ECF No. 2 ¶¶ 324–42, 377–97.

### 1.    Legal Framework

Section 1983 establishes a statutory cause of action to vindicate constitutional violations. 42 U.S.C. § 1983.  To state a claim under § 1983, plaintiffs must plead that they were "deprived of a federal constitutional or statutory right by a state actor."  *Coulter v. Coulter*, No. 23-2222, 2024 WL 163081, at *1 (3d Cir. Jan. 16, 2024);  *see Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (quoting 42 U.S.C. § 1983).  Thus, courts consider whether a plaintiff has "identif[ied] the exact contours of the underlying right said to have been violated" and "whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5

(1998)). Further, courts must also address the state actor element, which requires an individual to "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Harvey*, 635 F.3d at 609 (quoting *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998)).

"Section 1983 liability cannot be based solely upon the basis of *respondeat superior*." *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 473 (W.D. Pa. 2007) (Conti, J.) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Rather, an individual defendant in a § 1983 case "must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007) (internal quotations omitted). Personal involvement can be shown through particularized allegations of "actual knowledge and acquiescence" in the alleged violation. *See Rode*, 845 F.2d at 1207. Additionally, a supervisor's conduct may be actionable where they "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quotation omitted). "Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient." *Vo v. Wetzel*, No. 1:19-CV-00084-RAL, 2021 WL 6197743, at *8 (W.D. Pa. Dec. 31, 2021) (Lanzillo, M.J.), *aff'd*, No. 22-1210, 2022 WL 1467978 (3d Cir. May 10, 2022); *see also Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("[A § 1983] complaint is adequate where it states the conduct, time, place, and persons responsible.").

While "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), it "can be held liable [for constitutional violations] when the 'execution of a government's policy or custom . . .

inflicts the injury.'" *Bhatnagar v. Meyer*, No. 22-2848, 2023 WL 5378834, at *3 (3d Cir. Aug.

22, 2023) (citing *Monell*, 436 U.S. at 694).  To state a *Monell* claim, a plaintiff must allege that his

"harm was caused by a constitutional violation" and that "the municipality is responsible for that

violation." *Bhatnagar*, 2023 WL 5378834, at *3;  *see also Mann v. Palmerton Area Sch. Dist.*,

872 F.3d 165, 175 (3d Cir. 2017) ("A [school district] is liable under § 1983 when a plaintiff can

demonstrate that the [district] itself, through the implementation of a [district] policy or custom,

causes a constitutional violation.").  Where there is no underlying constitutional violation, a *Monell*

claim will not lie.  *Bhatnagar*, 2023 WL 5378834, at *3 (affirming dismissal of a *Monell* claim

after determining that the plaintiff "had no remaining cognizable constitutional claim").  Section

1983 claims brought against individual defendants acting in their official governmental capacities

"are subject to the same *Monell* standard for institutional liability" because such claims "essentially

are claims against the [government] itself." *Beers v. Cnty. of Northumberland*, No. 23-2555, 2024

WL 2874283, at *3 n.4 (3d Cir. June 7, 2024) (citing *Monell*, 436 U.S. at 690 n.55).

### 2.    The Court Will Dismiss Ms. Karabin's First Amendment Retaliation Claim (Count II)

In Count II, Ms. Karabin alleges that the District and Mr. Detschelt (in his individual and

official capacities)[10] retaliated against her in violation of the First Amendment to the United States

Constitution.  ECF No. 2 ¶¶ 324–50.  To make out a claim for First Amendment retaliation, Ms.

Karabin must allege (1) she engaged in protected conduct, (2) Defendants engaged in retaliatory

action sufficient to deter a person of ordinary firmness from exercising their First Amendment

rights, and (3) a causal connection between her protected activity and the Defendants' retaliatory

action. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

---

[10] The Complaint alleges that Mr. Detschelt is "sued both in his capacity as a private citizen and as a School Director with the Norwin Area School Board and the Norwin Area School District."  ECF No. 2 at 1.

Count II alleges that Defendants retaliated against Ms. Karabin by denying her request to attend a District board meeting remotely, thereby impermissibly excluding her from a limited public forum based on her viewpoint.  ECF No. 2 ¶¶ 324–50.  Defendants do not contest the first and third elements of Ms. Karabin's retaliation claim.  Rather, they argue that Ms. Karabin cannot satisfy the second element because the retaliatory conduct she complains of is Mr. Detschelt's speech, and a public official's speech cannot constitute retaliation unless it conveys a threat, coercion, or intimidation.  ECF Nos. 20 at 6–9;  28 at 7–10.  Ms. Karabin responds that Defendants misconstrue her argument, and that the retaliatory conduct she complains of is not Mr. Detschelt's speech, rather it is her alleged exclusion from attending a March 2023 District board meeting.  ECF Nos. 26 at 8–10;  31 at 6–11.

The Court agrees with Ms. Karabin that Defendants have not squarely addressed Ms. Karabin's theory of retaliation.  In opposing the instant Motions, Ms. Karabin makes it clear that the only retaliatory conduct she complains of is the alleged exclusion from the March 2023 District board meeting, and Mr. Detschelt's speech is only relevant in that it tends to establish a causal nexus between Ms. Karabin's protected activity and the Defendants' alleged retaliation.  *See* ECF No. 26 at 9–10 ("[The District's] arguments about Defendant Detschelt's speech are therefore beside the point.");  ECF No. 31 at 11 ("It is no coincidence that after all of [Mr. Detschelt's] harassing comments, Mrs. Karabin was not allowed to attend a School Board Meeting.").  In their briefing, Defendants have not addressed the substance of the Complaint's core allegation that Ms. Karabin's exclusion from a limited public forum—the District's March 2023 board meeting—was retaliatory.  *See generally* ECF Nos. 20, 26, 28.  Nor have they addressed Ms. Karabin's allegation that they engaged in impermissible viewpoint discrimination in excluding her from a limited public

forum based on her "political and social beliefs." ECF No. 2 ¶¶ 341–42. Accordingly, the Defendants have not established that Ms. Karabin fails to state a claim with respect to Count II.

However, Count II, as alleged, fails to state a claim against Mr. Detschelt and the District for other reasons. First, because Defendant Detschelt is named in both his individual and official capacities, ECF No. 2 at 1, the portion of Count II asserting an official-capacity claim against Defendant Detschelt is redundant and unnecessary given that the District is also named as a Defendant in this Count. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.") (cleaned up); *Blunt v. Lower Merion Sch. Dist.*, 559 F. Supp. 2d 548, 568 (E.D. Pa. 2008), *aff'd*, 767 F.3d 247 (3d Cir. 2014) (dismissing claims against individual school board members named in their official capacities as redundant because the school board was also named as a defendant).

With respect to the portion of Count II asserting an individual-capacity claim against Mr. Detschelt, the Complaint fails to allege his personal involvement in the decision to not provide Ms. Karabin with her requested accommodation. Rather, the Complaint only alleges that "the District, through counsel" responded to Ms. Karabin's accommodation request by informing her of alternative accommodations, which did not include remote access to the March 2023 board meeting. ECF No. 2 ¶¶ 245–48. That allegation is insufficient to state an individual-capacity claim against Mr. Detschelt under § 1983. *See Baraka*, 481 F.3d at 211 (stating that an individual defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved") (quotations omitted); *Reyes v. Gilmore*, Civ. Action No. 18-746, 2020 WL 734223, at *6 (W.D. Pa. Feb. 13, 2020) (Dodge, M.J.) (dismissing § 1983 claim where plaintiff

"failed to allege any personal involvement by [the defendant] or contemporaneous knowledge of the incident").

As for the portion of Count II asserting a claim against the District, the parties have not addressed that the District can only be "liable under § 1983 [if Ms. Karabin] can demonstrate that the [District] itself, through the implementation of a [District] policy or custom, cause[d] a constitutional violation." *Mann*, 872 F.3d at 175. Ms. Karabin has not alleged an official policy of the District that would permit *Monell* liability here. *See generally* ECF No. 2; *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) ("Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.") (quotations omitted). Nor has she sufficiently alleged a District custom. To be sure, Ms. Karabin does allege that at a District board meeting in January 2022, Mr. Detschelt stated that community members must attend board meetings in-person, and another board member stated that if community members could not attend in person they could submit comments ahead of time. ECF No. 2 ¶¶ 163–68. And Ms. Karabin further alleges that this occurred after she had requested an accommodation to appear remotely. *Id.* ¶¶ 127–28. But what District board members said at a single board meeting is insufficient to establish a permanent District custom. *See Lesher v. Zimmerman*, 822 F. App'x 116, 121 (3d Cir. 2020) ("[C]ustom is a permanent and well-established practice."); *Andrews*, 895 F.2d at 1480 ("A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law.") (quotations omitted). Thus, Ms. Karabin has not established a basis to hold the District liable under § 1983 with respect to Count II.

For the foregoing reasons, the portion of Count II asserting an official-capacity claim against Defendant Detschelt will be dismissed with prejudice.[11]  The portions of Count II asserting an individual-capacity claim against Defendant Detschelt and a claim against the District will be dismissed without prejudice and with leave to amend.

### 3.    The Court Will Dismiss Mr. and Ms. Karabin's Fourteenth Amendment Claims (Count VII)

In Count VII of the Complaint, Mr. and Ms. Karabin assert that the District has violated their Fourteenth Amendment substantive due process rights by interfering with their liberty interest in their parent-child relationship.  ECF No. 2 ¶¶ 377–86.  The gist of their claim is that the District violated Mr. and Ms. Karabin's rights by "callously disregard[ing] their children's emotional needs, physical needs, and fragility," and "fail[ing] to educate, train, and supervise its employees in the rights of students to be free from discrimination."  *Id.* ¶¶ 385–86.  The District argues that because the Karabins have failed to state a claim under Counts IV, V, VI, and VIII, Count VII necessarily fails.  ECF No. 20 at 21.  Mr. and Ms. Karabin respond that this is a circular argument and that they have stated a plausible claim.  ECF No. 26 at 21–23.

The Due Process Clause of the Fourteenth Amendment prohibits the government from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  This clause protects "against governmental interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  "One of the oldest fundamental liberty interests recognized by the Supreme Court is 'the interest of parents in the care, custody, and control of their children.'"  *D.C. v. Pittsburgh Pub. Sch.*, 415 F. Supp. 3d 636, 667 (W.D. Pa. 2019) (Horan, J.) (quoting *Troxel v. Granville*, 530 U.S. 57, 65

---

[11] "In eliminating the redundant claims against individually named persons, the court is merely simplifying the litigation in a way that does not cause any prejudice to plaintiffs."  *Blunt*, 559 F. Supp. 2d at 568.

(2000)). But "the Due Process Clause only protects against deliberate violations of a parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." *McCurdy v. Dodd*, 352 F.3d 820, 827–28 (3d Cir. 2003). Thus, where parents allege that a school's actions infringe on their liberty interest, "[a] conflict . . . will not be lightly found, and, indeed, only occurs when there is some manipulative, coercive, or restraining conduct by the State.'" *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 933–34 (3d Cir. 2011). In other words, "the parents' liberty interest will only be implicated if the state's action deprived them of their right to make decisions concerning their child, and not when the action merely complicated the making and implementation of those decisions.'" *Id.* at 934 (internal quotations omitted).

In their Opposition brief, Mr. and Ms. Karabin specify that the District violated their Fourteenth Amendment substantive due process rights in three ways: (1) the District denied J.K.'s right to non-discrimination and reasonable accommodations under the ADA and Rehabilitation Act, thereby interfering with "Mr. and Mrs. Karabin's rights in their children's well-being," (2) the District discriminated against the Karabins "based on their mutual affiliation with persons with disabilities," thereby interfering "with Plaintiffs' rights to the integrity and well-being of the family," and (3) the District's "systemic failure to train . . . interfered with their rights as a family unit." ECF No. 26 at 23. Ultimately, these theories all appear to depend on the same allegation that the District deprived Mr. and Ms. Karabin of their parental rights under the Fourteenth Amendment because it "knew that J.K.'s physical health prevented him from accessing specific elements of his educational programming" but "refused to assess this suspected area of disability." ECF No. 2 ¶ 361, ¶ 281 (alleging the District "ignored J.K.'s known severe physical fatigue and

related physical needs associated with his disability of ME/CFS" and improperly declined to evaluate whether J.K. needed specially designed instruction), ¶¶ 288–89.

This theory is too vague and attenuated to make the requisite showing that the District's conduct was "specifically aimed at interfering with protected aspects of the parent-child relationship," *McCurdy*, 352 F.3d at 827–28, and that the District deprived Mr. and Ms. Karabin "of their right to make decisions concerning their child" rather than "merely complicat[ing] the making and implementation of those decisions," *J.S.*, 650 F.3d at 934. *See also D.C.*, 415 F. Supp. 3d at 668 (dismissing a Fourteenth Amendment parental rights claim because it was "too attenuated to be the deliberate decision to deprive or interfere that is required"); *Skroupa v. Shaler Area Sch. Dist.*, No. CV 23-2008, 2024 WL 3292903, at *11 (W.D. Pa. July 3, 2024) (Dodge, J.) (same). Moreover, as with Ms. Karabin's § 1983 claim against the District in Count II, Count VII fails to allege a District policy or custom which caused a violation of Mr. and Ms. Karabin's Fourteenth Amendment rights. Thus, even if Mr. and Ms. Karabin's rights were violated, the Complaint does not allege a basis for holding the District liable. *See Mann*, 872 F.3d at 175.

Accordingly, the Court will dismiss Count VII without prejudice. The Court will, however, grant Mr. and Ms. Karabin leave to amend this Count.

### 4.  The Court Will Dismiss the Karabins' Failure to Train Claims (Count VIII)

In Count VIII of the Complaint, all four of the Karabins assert failure to train claims against the District pursuant to § 1983. ECF No. 2 ¶¶ 387–97. A plaintiff whose constitutional rights have been violated may bring a *Monell* claim against the governmental entity responsible on a theory that the plaintiff's harm was caused by the defendant's failure to adequately train or supervise its employees. *Est. of Kamal by & through Kamal v. Twp. of Irvington*, 790 F. App'x 395, 398 (3d Cir. 2019). To assert a failure-to-train claim, a plaintiff must show that this failure

"amounts to 'deliberate indifference' to the rights of persons with whom [the governmental entity's] employees will come into contact." *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020); *see also Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (stating that the "failure to train [must] "reflect[] a deliberate or conscious choice"). Such claims are "difficult" to establish. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A [local government's] 'culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'"); *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("Establishing municipal liability on a failure to train claim under § 1983 is difficult.").

Generally, municipal liability for the failure to train requires a plaintiff to identify a "pattern of similar constitutional violations by untrained employees" that "puts municipal decisionmakers on notice that a new program is necessary." *Johnson*, 975 F.3d at 403. But where a plaintiff does not allege a pattern of violations, he may establish municipal liability through a single incident where "the need for more or different training [was] so obvious," *id.*, or where the risk of injury was a "highly predictable consequence" of the failure to train, *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 225 (3d Cir. 2014). Therefore, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Wood v. Williams*, 568 F. App'x 100, 105 (3d Cir. 2014).

### a.     The Karabins Have Not Alleged an Underlying Constitutional Violation

At the outset, only Mr. and Ms. Karabin have asserted an underlying claim for violation of their constitutional rights. *See* ECF No. 2 ¶¶ 324–342, 377–86 (Count II asserting violations of Ms. Karabin's First Amendment rights and Count VII asserting violations of Mr. and Ms.

Karabin's Fourteenth Amendment rights). Neither Samantha nor J.K. are named Plaintiffs in any § 1983 Count apart from Count VIII. And, as the Court has already discussed, the Complaint fails to state a claim for violation of Ms. Karabin's First Amendment rights (Count II), and Mr. and Ms. Karabin's Fourteenth Amendment rights (Count VII). Thus, Count VIII will be dismissed because the Karabins have not alleged a viable constitutional violation. *See Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996) ("Of course, had there not been an underlying constitutional violation in the first instance, plaintiff's 'failure to train' claim against the City would not stand.").

Accordingly, the Court will dismiss Count VIII for failure to state a claim. However, because the Court will grant Ms. Karabin leave to amend Count II, and Mr. and Ms. Karabin leave to amend Count VII, the portions of Count VIII asserting claims by Mr. and Ms. Karabin will be dismissed without prejudice and with leave to amend in the event they can establish a constitutional violation. The portions of Count VIII asserting claims by Samantha and J.K. will be dismissed with prejudice.

## C.    The Karabins' ADA and Rehabilitation Act Claims (Counts IV, V, VI, IX, X, XI, and XII)

Counts IV through VI, and IX through XII are various disability-discrimination-related claims brought pursuant to the ADA and the Rehabilitation Act. ECF No. 2 ¶¶ 351–86, 398–421. Section 504 of the Rehabilitation Act provides, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination," with respect to "any program or activity receiving Federal financial assistance."[12]  29 U.S.C. § 794(a). Similarly, § 202 of the ADA reads, "[N]o qualified individual with a disability shall, by reason of such

---

[12] The Complaint alleges that the District is a recipient of federal funds subject to the Rehabilitation Act, ECF No. 2 ¶ 13, and Defendants do not dispute this allegation, *see generally* ECF Nos. 20, 26, 28.

disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The standard for determining liability for disability discrimination under the ADA and the Rehabilitation Act is generally the same, thus where a plaintiff alleges that both statutes were violated the Court "may address both claims in the same breath." *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Under either statute, a plaintiff must allege that that (1) they are a qualified individual with a disability, (2) they were precluded from participating in a program, service, or activity, or were otherwise subject to discrimination, and (3) their disability was the reason for the exclusion or discrimination. *Furgess v. Penn. Dep't of Corrections*, 933 F.3d 285, 288–89 (3d Cir. 2019). However, "[c]ausation standards differ between the ADA and RA: under the [Rehabilitation Act], the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023).

### 1. The Court Will Dismiss J.K.'s Failure to Accommodate Claims (Counts IV & V)

In Counts IV and V, J.K. alleges disability discrimination claims against the District in violation of the Rehabilitation Act and the ADA, respectively. ECF No. 2 ¶¶ 351–64. Specifically, J.K. alleges that the District violated the Rehabilitation Act and ADA by acting with deliberate indifference towards his disability because it "knew that J.K.'s physical health prevented him from accessing specific elements of his educational programming" but "refused to assess this suspected area of disability." *Id.* ¶ 361. The crux of J.K.'s claims is that is that the District "ignored J.K.'s known severe physical fatigue and related physical needs associated with his disability of ME/CFS." *Id.* ¶ 281. The District argues that Counts IV and IV should be dismissed for several

reasons.  First, it argues that Counts IV and V are barred because J.K. did not exhaust his administrative remedies.  ECF No. 20 at 10–15.  It further argues that these Counts merit dismissal because they are really failure to accommodate claims disguised as discrimination claims and J.K. was given reasonable accommodations, *id.* at 15–20, and the Complaint fails to state a claim for disability discrimination, *id.* at 21.  For the reasons discussed below, the Court will dismiss Counts IV and V for failure to exhaust administrative remedies.

### a.    J.K Was Required to Exhaust His Administrative Remedies

"Both the ADA and the [Rehabilitation Act] require public entities, including [schools], to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities." *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019).  J.K. has alleged that the District violated the Rehabilitation Act and the ADA by not providing him with reasonable medical accommodations at school.[13]  *See generally* ECF No. 2. The substance of these allegations implicates a third statute.  The Individuals with Disabilities Education Act ("IDEA") provides federal funding to states for the education of children with disabilities and requires participating states to provide a free appropriate public education ("FAPE") to eligible children.  *T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 182–83 (3d Cir. 2021). "The substance of a FAPE is primarily defined to be such 'special education and related services' that 'are provided in conformity with [a child's] individualized education program,' or 'IEP.'"  *Id.* (citing 20 U.S.C. § 1401(9)).

---

[13] While the Complaint styles Counts IV and V as more general disability discrimination claims, the District argues, and the Court agrees, that these claims are more appropriately viewed as failure to accommodate claims because the "discrimination" alleged is the District's failure to provide J.K. with accommodations requested by his parents.  *See* ECF Nos. 2 ¶¶ 351–64;  20 at 16.  Indeed, in responding the District's Motion to Dismiss, J.K. argues that the District failed to provide him with reasonable accommodations.  *See* ECF No. 26 at 18.

The IDEA provides a civil cause of action. *Id.* at 185 (citing 20 U.S.C. § 1415(i)(2)). But before filing suit, a potential plaintiff is required to exhaust their administrative remedies. *Id.* Importantly, that exhaustion requirement extends to non-IDEA claims—including claims brought under the ADA and Rehabilitation Act—where they are based on the denial of a FAPE. *Id.* Courts "look to the substance, or gravamen of the plaintiff's complaint" to determine whether an ADA or Rehabilitation Claim is based on the denial of a FAPE. *Id.* (quoting *Fry v. Napoleon Cmty. Schools*, 580 U.S. 154, 165 (2017). In evaluating the complaint, courts consider two questions:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.* at 185–86 (quoting *Fry*, 580 U.S. at 171). Answering either question in the affirmative means that the claim is not based on the denial of a FAPE and therefore subject to the IDEA's exhaustion requirement. *Id.* But even if a claim is based on the denial of a FAPE, a plaintiff need not exhaust their administrative remedies if they seek relief which is unavailable under the IDEA. *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 147–48 (2023). Thus, plaintiffs seeking compensatory damages need not exhaust their administrative remedies, *id.*, while plaintiffs seeking declaratory relief must satisfy the IDEA's exhaustion requirement, *Swope v. Cent. York Sch. Dist.*, 796 F. Supp. 2d 592, 600–01 (M.D. Pa. 2011).

Here, the District argues, and J.K. does not dispute, that Counts IV and V are FAPE-based claims. *See* ECF Nos. 20 at 10–15; 26 at 15; *see also* ECF No. 2 ¶ 361 (alleging that the District "prevented [J.K.] from accessing specific elements of his educational programming"). Rather, J.K. argues that he was not required to exhaust administrative remedies because he seeks "all appropriate remedies available under [the Rehabilitation Act] and the ADA" and this necessarily includes compensatory damages, which are not available under the IDEA. ECF No. 26 at 15. The

District responds by pointing out that that J.K. has specifically requested equitable remedies which are available under the IDEA. *See* ECF No. 29 at 2 (citing ECF No. 2 ¶¶ 429, 432).

The Court concludes that Counts IV and V, as currently plead, do not sufficiently allege a claim for compensatory damages. True, the final paragraph of these Counts requests "all appropriate remedies available under Section 504 and the ADA for the above-outlined violations." ECF No. 2 ¶ 364. And compensatory damages are an available remedy under the Rehabilitation Act and the ADA. *See S.H. ex rel Durell*, 729 F.3d at 261. But a request for "all appropriate remedies" is not necessarily a request for compensatory damages. *Cf. Carmona v. N.J. Dep't of Educ.*, No. 22-2874, 2023 WL 5814677, at *3 n.7 (3d Cir. Sept. 8, 2023) ("While the Parents made cursory references to damages, we find these cursory references insufficient to constitute a claim for damages."), *cert. denied*, 144 S. Ct. 1059 (2024). This is particularly true here, where the Complaint's prayer for relief does not request that J.K. be awarded compensatory damages but does seek specific equitable relief on his behalf. *See* ECF No. 2 ¶ 429 (requesting a declaration that "the District discriminated against J.K. on the basis of his disability" in violation of the Rehabilitation Act and the ADA). In addition, the Karabins' other claims under the Rehabilitation Act and the ADA *do* specifically request monetary damages. *See id.* at ¶¶ 376, 410, 421 (requesting "all remedies available under Section 504 and the ADA . . . ***including monetary damages***.") (emphasis added).

Because the Court concludes that Counts IV and V do not sufficiently allege a claim for compensatory damages but do seek equitable relief that is available under the IDEA, J.K. was required to exhaust his administrative remedies prior to filing suit. *See Perez*, 598 U.S. at 147–48. There is no dispute that J.K. failed to do so. *See* ECF No. 2 ¶ 362 (arguing that administrative exhaustion was not required); ECF No. 26 at 15 (same). Accordingly, the Court will dismiss

Counts IV and V, without prejudice.[14]  The Court will, however, grant J.K. leave to amend these Counts.

### 2. The Court Will Dismiss Mr. Karabin's and Samantha's Associational Discrimination Claims, but Not Ms. Karabin's or J.K.'s (Count VI)

In Count VI, all four of the Karabins assert associational discrimination claims against the District under the ADA and the Rehabilitation Act.  ECF No. 2 ¶¶ 365–376.

The ADA and Rehabilitation Act allow individuals to bring discrimination claims based their association with a disabled individual.  *See* 42 U.S.C. § 12112(b)(4) (allowing an individual to bring a claim who was denied benefits "because of the known disability of [another] with whom the qualified individual is known to have a relationship or association");  *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405–06 (3d Cir. 2005);  *Doe v. Cnty. of Ctr.*, 242 F.3d 437, 447 (3d Cir. 2001).  To assert such a claim, a plaintiff must establish the following:  (1) he or she has an association with a disabled individual that is "logical and significant";  (2) the defendant knew of that association;  (3) the defendant discriminated against the individual because of that association;  (4) the individual suffered a direct injury because of the discrimination.  *S.K. v. N. Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 712 (W.D. Pa. 2015) (Conti, then-C.J.) (quoting *Schneider v. Cnty. of Will*, 190 F. Supp. 2d 1082, 1091 (N.D. Ill. 2002));  *D.C. v. Pittsburgh Pub. Sch.*, 415 F. Supp. 3d 636, 666 (W.D. Pa. 2019) (Horan, J.).  "Discrimination based on association thus requires a separate and distinct denial of a benefit or service to [the plaintiff];  it may not be

---

[14] While the District's Motion to Dismiss is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the dismissal of Counts IV and V is for lack of subject matter jurisdiction and therefore dismissal is without prejudice. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 273 (3d Cir. 2014) (stating that failure to exhaust the IDEA's administrative remedies divests a federal court from asserting subject matter jurisdiction over federal claims); *Onyiuke v. New Jersey*, 242 F. App'x 794, 797 (3d Cir. 2007) (citing *In re Orthopedic "Bone Screw" Prods. Liab. Litig.*, 132 F.3d 152, 155 (3d Cir. 1997) ("[A] dismissal of an action for lack of subject matter jurisdiction is not a decision on the merits; therefore such a dismissal should be without prejudice.").

premised on a derivative benefit or harm based on treatment towards a disabled person." *D.C.*, 415 F. Supp. 3d at 666 (quotation omitted).

Here, the Karabins allege that the District discriminated against them "as a family unit because of their mutual association with people with disabilities [*i.e.*, each other], the result being the District's failure to provide sufficient support to students with significant special needs and excluding parents concerned about students with such needs." *Id.* ¶ 371. The District argues that Count VI is a FAPE-based claim subject to administrative exhaustion, and therefore should be dismissed because the Karabins did not exhaust their administrative remedies. ECF No. 20 at 10–15. The District further argues that Count VI should be dismissed because it is predicated on the District not providing the Karabins with reasonable accommodations, and the District did provide such accommodations. ECF No. 20 at 15–20. The Karabins respond that Count VI is not a FAPE-based claim and therefore there was no need to for them to exhaust their administrative remedies, and in any event, they were not provided with reasonable accommodations. ECF No. 26 at 15–16.

### a.    The Court Will Dismiss Mr. Karabin's Associational Discrimination Claims

At the outset, the Court will dismiss Mr. Karabin's associational discrimination claim against the District. The Complaint simply does not allege "a separate and distinct denial of a benefit or service to [Mr. Karabin]." *D.C.*, 415 F. Supp. 3d at 666; *see generally* ECF No. 2. The Court therefore cannot even reach the point where it can determine whether Mr. Karabin's claim is FAPE-based and subject to administrative exhaustion. Accordingly, the Court will dismiss the portion of Count VI asserting a claim by Mr. Karabin without prejudice and with leave to amend.

### b.    The Court Will Dismiss Samantha's Associational Discrimination Claims, but Not J.K.'s

With respect to J.K.'s and Samantha's associational discrimination claims, the Court agrees with the District that these are FAPE-based claims. The Complaint alleges that "[t]he District discriminated against both Samantha and J.K. because of an association with Mrs. Karabin by continuously failing to implement appropriate supports and services." ECF No. 2 ¶ 375. Thus, the "substance, or gravamen" of the Complaint reveals that J.K.'s and Samantha's associational discrimination claims are based on the District's failure to provide them with a FAPE.[15] As such, they are subject to administrative exhaustion to the extent the relief sought is also available under the IDEA. *See T.R.*, 4 F.4th at 185–86. Ultimately, however, this conclusion is not fatal because Samantha and J.K. have sought an award of monetary damages in connection with their associational discrimination claims. ECF No. 2 ¶ 376 (seeking "all remedies available under [the Rehabilitation Act] and the ADA for these violations, ***including monetary damages***) (emphasis added). Plaintiffs seeking compensatory damages under the ADA and Rehabilitation Act need not exhaust administrative remedies. *Perez*, 598 U.S. at 147–48.

However, the Court will dismiss Samantha's associational discrimination claim in Count VI on other grounds. Specifically, the District has argued Samantha's claim should be dismissed because it is predicated on her not receiving reasonable accommodations, but the District did provide such accommodations. ECF No. 20 at 16–19. The Court agrees that Samantha's claim is based on a failure to accommodate. *See* ECF No. 2 ¶ 375. And in opposing the District's Motion, Samantha does not contest the District's assertion that she received reasonable accommodations.

---

[15] A *Fry* analysis confirms that J.K.'s and Samantha's associational claims are FAPE-based. First, Samantha and J.K. could not "have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school," *Fry*, 580 U.S. at 171, because the discrimination they complain of is the District's "fail[ure] to implement appropriate [educational] supports and services," ECF No. 2 ¶ 375. For the same reason, an adult at their school could not "have pressed essentially the same grievance." *Fry*, 580 U.S. at 171.

ECF No. 26 at 17–19. As such, Samantha has waived any argument that she was not provided reasonable accommodations, and therefore she cannot establish that she was discriminated against for purposes of her associational discrimination claim in Count VI. *See Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (concluding that because the plaintiff had "ample opportunity to make this argument in response to defendants' motion to dismiss and failed to do so. . . . the District Court exercised sound discretion when it refused to consider an argument that, in effect, had been waived"); *Daugherty v. Adams*, No. CV 17-368, 2019 WL 7987859, at *13 (W.D. Pa. Nov. 15, 2019) (Kelly, J.), *report and recommendation adopted sub nom. Daugherty v. Tiversa Holding Corp.*, No. CV 17-368, 2020 WL 467828 (W.D. Pa. Jan. 29, 2020) (Horan, J.), *aff'd sub nom. LabMD Inc. v. Boback*, 47 F.4th 164 (3d Cir. 2022) ("[B]ecause Plaintiffs had an opportunity to respond to the substance of the arguments briefed by Defendants [in their motion to dismiss], to the extent Plaintiffs have failed to do so, the Court should deem those arguments waived.").

Turning to J.K., the Court will not dismiss his claim in Count VI to the extent he seeks compensatory damages. As with Samantha's associational discrimination claim, J.K.'s claim is based on a failure to accommodate. *See* ECF No. 2 ¶ 375. While the District argues that J.K. was provided reasonable accommodations and "Plaintiffs essentially take the position that the only reasonable accommodation appropriate in light of Plaintiffs' conditions is a requirement of universal masking in the School District," ECF No. 20 at 18–19, J.K. takes no such position, *see* ECF No. 26 at 19 (noting that the accommodations sought for J.K. "were unrelated to a universal masking policy at Norwin"). Indeed, the Complaint alleges that the District declined to offer J.K. specialized instruction on account of his disability, and in doing so "ignored J.K.'s known severe physical fatigue and related physical needs associated with his disability of ME/CFS." ECF No. 2 ¶¶ 280–81, 288–89. Because the accommodations cited by the District do not bear on this

allegation, the Court will not dismiss J.K.'s claims in Count VI to the extent the discrimination he complains of was the District's failure to offer specialized instruction on account of his disability.

For the foregoing reasons, the Court will dismiss Samantha's associational discrimination claim in Count VI, with prejudice. *See Oxford House, Inc. v. Twp. of N. Bergen*, No. CV 21-19260 (ES) (CLW), 2024 WL 2292053, at *7–8 (D.N.J. May 21, 2024) (dismissing claims with prejudice after determining they had been waived by plaintiff). The Court will not dismiss J.K.'s associational discrimination claim in Count VI for failure to exhaust administrative remedies to the extent he seeks an award of compensatory damages. The Court will, however, dismiss J.K.'s claim to the extent he seeks equitable relief that is also available under the IDEA. *See Perez*, 598 U.S. at 151 ("Under our view . . . a plaintiff who files an ADA action seeking both damages and the sort of equitable relief IDEA provides may find his request for equitable relief barred or deferred if he has yet to exhaust.").

### c.    The Court Will Not Dismiss Ms. Karabin's Associational Discrimination Claim

As for Ms. Karabin's associational discrimination claim, the Court concludes that this is not a FAPE-based claim. The Complaint alleges that the District discriminated against the Karabins by "excluding parents." ECF No. 2 ¶ 371. Drawing all inferences in Ms. Karabin's favor, the Court interprets this allegation to at least refer to the alleged exclusion of Ms. Karabin from the District's March 2023 board meeting. *See* ECF No. 2 ¶¶ 245. Thus, Ms. Karabin's associational discrimination claim is not based on the denial of a FAPE.[16] Accordingly, the Court will not dismiss Ms. Karabin's associational discrimination claim for failure to exhaust

---

[16] Ms. Karabin could "have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school." *Fry*, 580 U.S. at 171. For example, Ms. Karabin could bring essentially the same claim on a theory that she was excluded from a city council meeting because of her association with a disabled person. And another adult at the school could "have pressed essentially the same grievance" as Ms. Karabin if they were excluded from the March 2023 board meeting on account of their association with a disabled person. *Fry*, 580 U.S. at 171.

administrative remedies. Furthermore, as will be explained below, because Ms. Karabin has alleged a plausible failure to accommodate claim, the Court will not dismiss her associational discrimination claim in Count VI for failure to state a claim.

### 3. The Court Will Not Dismiss Ms. Karabin's Failure to Accommodate Claim Based on Her Alleged Exclusion from the District's March 2023 Board Meeting (Counts IX & X)

In Counts IX and X, Ms. Karabin asserts failure to accommodate claims against the District under the Rehabilitation Act and the ADA, respectively. ECF No. 2 ¶¶ 398–410.

As an alternative to general disability discrimination, "a plaintiff can assert a failure to accommodate as an independent basis for liability" under the ADA and Rehabilitation Act. *Muhammad v. Ct. of Common Pleas of Allegheny Cnty., Pa.*, 483 F. App'x 759, 763 (3d Cir. 2012). "To make out such a claim, a plaintiff must show that the accommodation he seeks is reasonable, *i.e.*, that it is necessary to avoid discrimination on the basis of disability." *Id.* (internal quotation omitted). Thus, "[t]he burden is at first on [the plaintiff] to articulate a reasonable accommodation." *D.A. by & through D.A. v. Penn Hills Pub. Sch. Dist.*, No. 2:20-CV-1124-NR, 2021 WL 1929287, at *5 (W.D. Pa. May 13, 2021) (Ranjan, J.). "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." *Id.*; *see also Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 123 (3d Cir. 2018) ("[C]laims alleging failure to accommodate under the RA involve the same tripartite inquiry as those under the ADA: (1) whether the requested accommodation is reasonable; (2) whether it is necessary; and (3) whether it would fundamentally alter the nature of the program."). "[W]hile a plaintiff may not insist on a particular accommodation if another reasonable accommodation was offered . . . such an

alternative, in order to defeat necessity and serve as a defense, also must provide [] meaningful access." *Berardelli*, 900 F.3d at 125 (cleaned up).

Under any theory of liability, if a plaintiff seeks compensatory damages they must also demonstrate the defendant's intentional discrimination. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261–64 (3d Cir. 2013); *see also Pukanecz v. BARTA Transit Auth.*, No. 5:20-CV-00561, 2020 WL 3446189, at *5 (E.D. Pa. June 24, 2020) (requiring a failure-to-accommodate plaintiff to establish intentional discrimination). They may do so by establishing the defendant's deliberate indifference, that is, their "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) *failure to act* despite that knowledge." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014).

### a.   Ms. Karabin Has Waived Any Argument That She Was Not Provided Reasonable Accommodations to Attend Samantha's Graduation and Mean Girls

Ms. Karabin alleges that the District failed to provide her with reasonable accommodations on three different occasions in 2023:  Samantha's graduation ceremony, a high school play *Mean Girls*, and a March 2023 District board meeting.[17]  ECF No. 2 ¶¶ 408–410.  The District argues that Counts IX and X should be dismissed because it offered—and Ms. Karabin received— reasonable accommodations on all three occasions, and that it was only obligated to provide reasonable accommodations, not Ms. Karabin's preferred accommodations.  ECF No. 20 at 17– 20.  In response, Ms. Karabin only argues that the accommodations that were offered for her to attend the March 2023 board meeting were insufficient.  ECF No. 26 at 19.  She does not respond to the District's arguments that she was given reasonable accommodations to attend Samantha's

---

[17] Counts IX and X refer generically to "school board meetings," but the gist of the Complaint and Ms. Karabin's Opposition brief make it clear that it is one particular meeting in March 2023 that is the subject of her failure to accommodate claims.  *See* ECF No. 2 ¶¶ 237–48;  ECF No. 26 at 19.

graduation and *Mean Girls*. *Id.*; *see also* ECF No. 20 at 17–20 (identifying numerous accommodations provided by the District). As such, Ms. Karabin has waived any argument that she was not provided reasonable accommodations for Samantha's graduation and *Mean Girls*. *See Dreibelbis*, 274 F. App'x at 185; *Daugherty*, 2019 WL 7987859, at *13. Accordingly, the Court will dismiss the portions of Counts IX and X that allege a failure to accommodate based on Samantha's graduation and *Mean Girls* and limit its analysis to whether Ms. Karabin has stated a plausible failure to accommodate claim based on her alleged exclusion from the District's March 2023 board meeting.

> **b.**    **Ms. Karabin Has Stated a Plausible Failure to Accommodate Claim Based on the March 2023 District Board Meeting**

Ms. Karabin requested an accommodation to participate in the public comment segment of the District's March 2023 board meeting remotely via a videoconference platform such as Zoom or Microsoft Teams. ECF No. 2 ¶¶ 237–38. She requested this accommodation because her disability of ME/CFS rendered her "largely bedridden" and "she was often unable to attend Board meetings [in-person]." *Id.* ¶¶ 231, 235–36. Thus, she alleges that the accommodation was necessary "so that she could benefit, speak, listen, participate fully, and make public comments just as she would otherwise be able to do were she not disabled and prevented from attending in person." *Id.* ¶ 239. In response, the District advised Ms. Karabin that she could submit written comments for the board's consideration in advance of the meeting, and that she could view the board meeting live on YouTube. *Id.* ¶¶ 245–47. The District further advised that if Ms. Karabin did attend in-person, the meeting could be held in the cafeteria where she could practice social distancing to accommodate her immunocompromised condition. *See id.* ¶¶ 232, 248.

The District argues that these were reasonable accommodations, and that Ms. Karabin was "essentially tak[ing] the position that the only reasonable accommodation appropriate in light of

[her] condition[] [was] a requirement of universal masking."  ECF No. 20 at 17–20.  But Ms. Karabin takes no such position with respect to the March 2023 board meeting.  Rather, the Complaint alleges, and Ms. Karabin argues in her Opposition brief, that the accommodation she requested was attending the March 2023 board meeting remotely to allow her "active participation" at the meeting.  *See* ECF No. 26 at 19;  ECF No. 2 ¶ 408 ("[W]ithout a remote platform option, Mrs. Karabin was excluded from and denied the opportunity to fully participate in the live public comment section of school board meetings.").  She thus argues that the accommodations offered by the District—submitting comments in advance and watching a livestream of the meeting on YouTube—were insufficient to provide her with "meaningful access."  *Berardelli*, 900 F.3d at 125;  *see* ECF No. 26 at 19 (explaining that the District's offer to hold the meeting in the cafeteria was an empty gesture because it knew Ms. Karabin could not attend in-person, and that submitting comments beforehand and watching a livestream was not a substitute for "active participation.").  The District does not engage with this contention.  *See* ECF No. 20 at 17–20;  ECF No. 29.  Nor does it argue, as it might have, that Ms. Karabin's requested accommodation would "fundamentally alter the nature of the program."  *Berardelli*, 900 F.3d at 123.  Accordingly, drawing all inferences in her favor, the Court concludes that Ms. Karabin has stated a plausible failure to accommodate claim based on the District's denial of her request to attend the March 2023 board meeting remotely.

The analysis does not end there, however.  Because Ms. Karabin seeks an award of monetary damages in connection with Counts IX and X, ECF No. 2 ¶ 410, she must also plausibly allege that the District acted with deliberate indifference in failing to provide reasonable accommodations.  *See Pukanecz*, 2020 WL 3446189, at *5;  *J.L. v. Lower Merion Sch. Dist.*, No. CV 20-1416-KSM, 2025 WL 35759, at *7 (E.D. Pa. Jan. 6, 2025) ("[W]hen a plaintiff brings

claims for compensatory damages under the ADA and/or [the Rehabilitation Act] . . . the plaintiff must prove intentional discrimination to prevail in its case in chief.").  Here, the Complaint sufficiently alleges that the District had knowledge that Ms. Karabin's rights were substantially likely to be violated without an accommodation.  *See* ECF No. 2 ¶¶ 237–38.  And at this early stage of these proceedings, the allegations in the Complaint are sufficient to establish that the District failed to take appropriate action as a result.  *See* ECF No. 2 ¶ 408–09.

For all of the foregoing reasons, the Court will not dismiss the portion of Counts IX and X that allege a failure to accommodate based on the March 2023 District board meeting but will dismiss those portions that allege a failure to accommodate based on Samantha's graduation and the *Mean Girls* production.

### 4.  The Court Will Partially Dismiss Ms. Karabin's Retaliation Claims (Counts XI and XII)

In Counts XI and XII, Ms. Karabin alleges that the District and Mr. Detschelt retaliated against her in violation of the Rehabilitation Act, and the ADA, respectively.[18]  ECF No. 2 ¶¶ 411–21.  Specifically, Ms. Karabin alleges that the District "ignored or denied" the "disability-related accommodations [she requested] on behalf of herself, J.K., and Samantha."  ECF No. 2 ¶¶ 416, 418.  She also alleges that Mr. Detschelt "attacked [her] character and disability-related claims in a public setting (i.e., Facebook) and sent emails to [her] directly taunting her for engaging in protected activity related to her disability."  *Id.* ¶ 419.  Defendants have moved to dismiss these Counts for the same reasons they argue Ms. Karabin's First Amendment retaliation claims in Count

---

[18] Ms. Karabin's ADA retaliation claims are brought pursuant to 42 U.S.C. § 12203.  ECF No. 2 ¶¶ 411–21.  And her retaliation claims under the Rehabilitation Act are brought pursuant to 34 C.F.R. § 100.7(e), which implements Section 504 of the Rehabilitation Act, codified at 20 U.S.C. § 794(a).  *Id.*

II warrant dismissal, namely, that Mr. Detschelt's speech cannot constitute retaliation. ECF Nos. 20 at 6–9; 28 at 7–10.

Retaliation claims under the ADA and Rehabilitation Act require the same showing as First Amendment retaliation claims: Ms. Karabin must allege (1) she engaged in protected conduct, (2) Defendants engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising their rights, and (3) a causal connection between her protected activity and the Defendants' retaliatory action. *See Lauren W.*, 480 F.3d at 267 (evaluating retaliation claims under § 1983 and the Rehabilitation Act together); *Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 300 (M.D. Pa. 2008) (evaluating retaliation claims under the ADA and the Rehabilitation Act together).

As with Ms. Karabin's First Amendment claim in Count II, the Court notes that Defendants have misconstrued the retaliation Ms. Karabin complains of as Mr. Detschelt's speech, when she has alleged that it was her exclusion from the District's March 2023 board meeting that was retaliatory. While Counts XI and XII do allege that "[a]dditionally . . . Mr. Detschelt attacked Mrs. Karabin's character," the thrust of the Complaint's allegations is that the Defendants retaliated against Ms. Karabin by "ignor[ing] [and] den[ying] Mrs. Karabin's requests" for accommodations. ECF No. 2 ¶¶ 411–21. As noted, in opposing the instant Motions, Ms. Karabin makes it clear that the only retaliatory conduct she complains of in Counts XI and XII is the alleged exclusion from the March 2023 District board meeting, and Mr. Detschelt's speech is only relevant in that it tends to establish causation. *See* ECF No. 26 at 9–10; ECF No. 31 at 6–11 ("It is no coincidence that after all of Defendant's harassing comments, Mrs. Karabin was not allowed to attend a School Board Meeting in a manner that Defendant had said on record that he did not support."). Because the Defendants have not substantively addressed this theory, they have not

established that Ms. Karabin fails to state a claim with respect to Counts XI and XII. However, the Court finds that certain portions of these Counts merit dismissal and will narrow their scope accordingly.

To the extent that Count XI asserts a retaliation claim under the Rehabilitation Act against Mr. Detschelt in his individual capacity, such claim must be dismissed. Because the Complaint does not establish that Mr. Detschelt individually is a recipient of federal funds, he is not subject to liability under the Rehabilitation Act in that capacity. *See Datto v. Harrison*, 664 F. Supp. 2d 472, 493 (E.D. Pa. 2009) (dismissing Rehabilitation Act retaliation claims asserted against individual defendants). And to the extent Count XI asserts a claim against Mr. Detschelt in his official capacity as a District "School Board School Director/Board Member," ECF No. 2 ¶ 12, such a claim is redundant and unnecessary because the District has already been named as a Defendant. *See Pennington v. Midd-W. Sch. Dist.*, No. 4:11-CV-02334, 2012 WL 2328198, at *1 (M.D. Pa. June 19, 2012) (dismissing Rehabilitation Act retaliation claim brought against individual in his official capacity "because a lawsuit against public [officials] in their official capacities is functionally a suit against the public entity that employs them," and the public entity was also named as a defendant). For the same reason, the official-capacity ADA retaliation claim asserted against Mr. Detschelt in Count XII will be dismissed. *Id.*; *see also Blunt*, 559 F. Supp. 2d at 568.

As for the individual-capacity ADA retaliation claim asserted against Mr. Detschelt in Count XII, "[w]hether the ADA imposes liability upon individuals for claims of retaliation is an issue that has divided the federal courts." *Datto*, 664 F. Supp. 2d at 486; *see also Constantine v. N.J. Dep't of Banking & Ins.*, No. 23-2423, 2024 WL 1988829, at *6 n.9 (3d Cir. May 6, 2024) ("We have apparently not addressed whether the ADA's anti-retaliation provision provides for

individual liability. . . . We take no position on the issue here but instead assume that Section 12203 permits individual liability for retaliation claims predicated on conduct ostensibly protected by Title II.").  But even assuming that Ms. Karabin may assert an individual retaliation claim against Mr. Detschelt under the ADA, she has failed to describe how he was responsible for the District's decision to not allow her to attend the March 2023 board meeting remotely.  *See* ECF No. 2 ¶ 245–48 (asserting only that "the District, through counsel" responded to Ms. Karabin's accommodation request offering her accommodations which did not include remote access to the March 2023 board meeting).   Accordingly, the Court will dismiss the portion of Count XII asserting an ADA retaliation claim against Mr. Detschelt in his individual capacity for failure to establish the second required element of such claim:  that Mr. Detschelt engaged in retaliatory conduct by excluding Ms. Karabin from the March 2023 board meeting.  The Court will, however, grant Ms. Karabin leave to amend her individual capacity claim against Mr. Detschelt in Count XII.

For the foregoing reasons, the Court will dismiss the portion of Count XI asserting a claim against Defendant Detschelt in his individual and official capacities with prejudice and dismiss the portion of Count XII asserting a claim against Defendant Detschelt in his official capacity with prejudice.  The Court will dismiss the portion of Count XII asserting a claim against Defendant Detschelt in his individual capacity without prejudice and with leave to amend.  The Court will not dismiss the portions of Counts XI and XII asserting claims against the District.

### D.    Ms. Karabins' State Law Claims (Counts I and III)

In Count I, Ms. Karabin asserts a Pennsylvania state law claim for defamation against Mr. Detschelt, and in Count III she asserts a claim for retaliation in violation of the Pennsylvania Constitution against both Defendants.  ECF No. 2 ¶¶ 301–23, 343–50.

### 1.    The Court Will Partially Dismiss Ms. Karabin's Defamation Claim (Count I)

In Count I of the Complaint, Ms. Karabin alleges that Mr. Detschelt defamed her in violation of Pennsylvania state law when he made sixteen posts on his personal Facebook and Substack accounts. ECF No. 2 ¶¶ 301–23. Mr. Detschelt has moved to dismiss Count I, arguing that the statements cited by Ms. Karabin are either (1) true, (2) privileged political speech, or (3) matters of public concern. ECF No. 28 at 5–7. Mr. Detschelt makes these arguments in the aggregate and not with respect to any specific statement. *Id.* In response, Ms. Karabin argues that the challenged statements were demonstrably false, did not involve politics, and did not involve matters of public concern. *See* ECF No. 31 at 3–6.

"To state a cause of action for defamation under Pennsylvania law, a plaintiff must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion [if it has been raised as a defense]." *Casselli v. City of Phila.*, 54 F. Supp. 3d 368, 376 (E.D. Pa. 2014) (citing 42 Pa. C.S.A. § 8343(a)). If a defamation claim is properly raised, the defendant has the burden of proving a defense in the form of "(1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; and (3) the character of the subject matter of defamatory comments as of public concern." *Id.* (citing 42 Pa. C.S.A. § 8343(b)). Where an allegedly defamatory statement is a matter of public concern, the plaintiff bears the burden of proving the statement's falsity. *Monge v. Univ. of Penn.*, 674 F. Supp. 3d 195, 206 (E.D. Pa. 2023). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject

of legitimate news interest;  that is, a subject of general interest and of value and concern to the public." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

In conducting a defamation analysis, courts should first consider whether a particular statement is capable of being defamatory.  *Id.*;  *see also Mzamane*, 693 F. Supp. 2d 442, 480 (E.D. Pa. 2010) ("[U]nder Pennsylvania law, the Court acts as a gatekeeper to determine whether the statements are incapable of defamatory meaning.").  A statement is considered defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession." *Mzamane*, 693 F. Supp. 2d at 477 (quoting *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008).  "It is not enough that the victim of the [statements] . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society."  *Id.* (quoting *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004)).

"Importantly, only statements of fact, rather than mere expressions of [pure] opinion, are actionable under Pennsylvania law."  *Id.* (citing *Moore v. Cobb–Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005)).  But statements of opinion can still be defamatory if they can "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion."  *Id.* (quotation omitted).  By the same token, even where the challenged statements are literally accurate, they may nonetheless be defamatory where they create a defamatory implication (*i.e.*, defamation by innuendo).  *Id.* (collecting cases);  *see also Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982)) ("[A] defendant cannot use truth as a defense where 'the implication of the communication as a whole was false.'").

A statement is defamatory by implication where it "can 'fairly and reasonably be construed' to imply the defamatory meaning alleged by a plaintiff.'" *Taylor v. Gural*, No. CV 23-4882, 2025 WL 638596, at *12 (E.D. Pa. Feb. 27, 2025) (quoting *Menkowitz v. Peerless* Publ'ns, Inc., 176 A.3d 968, 982 (Pa. Super. 2017)); *see also Monge*, 674 F. Supp. 3d at 208 (quoting *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. 1992)) ("To establish defamation by innuendo, the innuendo must be warranted, justified and supported by the publication."). Conversely, if the plaintiff "puts an unfair and forced construction on the interpretation of the publication" it is not actionable. *Taylor*, 2025 WL 638596, at *12 (quotation omitted). However, liability can still attach where there is at least one defamatory interpretation. *See id.* (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987)) (stating that where there are competing innocent and defamatory meanings, "it is for the jury to determine if the defamatory meaning was understood by the recipient.").

Turning to the statements Ms. Karabin challenges, the Court will evaluate each statement to determine whether it could have a defamatory meaning and whether any of Mr. Detschelt's proffered defenses apply.

### a.    Ms. Karabin Has Stated a Plausible Defamation Claim Regarding Three of the Challenged Statements

The Court finds that three of the challenged statements are capable of being defamatory. The first such statement is:

> *Apparently, she believes that laziness is an ADA recognized disability, which is a slap in the face to those with true disabilities who have shown up at our meetings to speak.*

ECF No. 2 ¶ 315(a).

The Court concludes that a reader could interpret this statement as conveying that Ms. Karabin did not have a "true disabil[ity]," and was therefore lying about the existence or severity

of her medical conditions.  And although the statement that "apparently, [Ms. Karabin] believes that laziness is an ADA recognized disability" may be interpreted as a non-actionable insult or statement of opinion, it implies the existence of defamatory facts underlying the opinion—that Ms. Karabin did not have a real disability and only suffered from "laziness."  *See Mzamane*, 693 F. Supp. 2d at 477 (noting statements of opinion are actionable where they "imply the existence of undisclosed defamatory facts justifying the opinion.").  But Ms. Karabin has alleged that she had a diagnosed disability of ME/CFS, and that Mr. Detschelt was aware of it.  ECF No. 2 ¶¶ 33, 208, 231, 311, 313.  Mr. Detschelt has not disputed those allegations.  *See generally* ECF No. 28.  The implication that Ms. Karabin was lying about having a disability "tends to blacken [her] reputation or expose [her] to public hatred, contempt, or ridicule."  *Mzamane*, 693 F. Supp. 2d at 477;  *see also Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) (quoting *Tucker*, 848 A.2d at 124) ("In considering whether a statement is capable of defamatory meaning, the court considers 'whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him.'").  Indeed, Ms. Karabin alleges that recipients of Mr. Detschelt's statements "responded to and joined in Defendant Detschelt's posts attacking Mrs. Karabin, echoing his characterization of Mrs. Karabin as crazy, lazy, or a liar."  ECF No. 2 ¶¶ 320, 323 (alleging that Mr. Detschelt's statements caused Ms. Karabin loss of standing in her community).

As for Mr. Detschelt's proffered defenses that the statement was either true, privileged political speech, or involved a matter of public concern, the Court is not persuaded.  Even if Ms. Karabin actually "believe[d] that laziness is an ADA recognized disability," the statement as a whole carries a defamatory implication that Ms. Karabin was not actually disabled.  *See Graboff*, 744 F.3d at 136 (stating that literally true statements can still be defamatory).  As noted, Mr.

Detschelt has not disputed that Ms. Karabin had a disability. *See generally* ECF No. 28. Furthermore, the statement does not involve politics and therefore does not appear to implicate what Mr. Detschelt terms "privileged political speech." ECF No. 28 at 5. And even if the statement touches on a matter of public concern, the effect of such a conclusion would simply put the burden on Ms. Karabin to prove the defamatory implication's falsity, and as noted, she has done enough to carry that burden at the pleading stage. *See Morgenstern v. Fox Television Stations of Phila.*, No. CIV.A. 08-0562, 2008 WL 4792503, at *9 (E.D. Pa. Oct. 31, 2008) (finding that although the statements at issue were matters of public concern, plaintiff had met his burden of alleging the statements' falsity at the motion to dismiss stage).

Next, Ms. Karabin challenges the following statement:

*The only disability she's shown is that of being an attention-seeker.*

ECF No. 2 ¶ 315(b). The Court concludes that this statement is capable of defamatory meaning for the same reasons as the first statement. Namely, the statement implies that Ms. Karabin was lying about having a disability, and such an allegation "tends to blacken [her] reputation." *Mzamane*, 693 F. Supp. 2d at 477; *see also Burton*, 707 F.3d at 434. Furthermore, Mr. Detschelt fails to establish the statement's truth, and it does not involve political discourse or a matter of public concern.

Finally, though not included in her enumerated list, Ms. Karabin also claims that Mr. Detschelt defamed her when he made a Facebook post where he wrote the following:

*Melissa need[s] to call 911 for a 201 voluntary commitment and to admit to having Munchausen Syndrome.*

ECF No. 2 ¶¶ 252, 316. As Ms. Karabin explains, "Munchausen Syndrome is a mental health disorder wherein the individual falsifies, exaggerates, or induces physical, emotional, or cognitive disorders." *Id.* ¶ 252. Thus, the Court finds that this statement is capable of defamatory meaning

for the same reason as the previous two.  Namely, it implies that Ms. Karabin was lying about or exaggerating her disability.  As with the previous two statements, Mr. Detschelt has not established the truth of the statement.  And the statement does not involve political discussion, nor does it touch on a matter of public concern.

For the foregoing reasons, the Court will not dismiss the portions of Count I asserting that the statements in paragraphs 252, 315(a), 315(b), and 316 of the Complaint were defamatory.[19]

### b.    Ms. Karabin Has Not Stated a Plausible Defamation Claim Regarding the Remaining Challenged Statements

The remaining statements which Ms. Karabin alleges are defamatory are as follows:

*I yield to the power of **Crazy Karabin** (your competition name), knowing that my copy and paste ability is for naught when matched against the 24/7 willpower and determination of someone whose energy would just **bounce off a padded room's walls**. Will you share with us your secrets?  I feel like not being on medication (sedation?) is the key to the magic!*

\* \* \*

***Seriously, you are not only playing without a full deck, but you're not even playing with a deck****... mental disorders are a serious issue and I keep saying that your family and friends need to stop enabling your behavior and get you the help you need. Thank Democrats for shutting down the state mental hospitals. Ugh.*

\* \* \*

*Um, every one of your hundred posts today has been about me and now you're telling me that I should stop harassing you? Are you out **of your freakin' mind?!?!?! Yes, yes you are. If you could only see me trying hard not to laugh at the insanity of your insanity.***

\* \* \*

***Crazy Karabin*** *attacks me every day, so for every 200 posts of hers I'm not allowed to point out her **ADS (Alex Derangement Syndrome)**.*

---

[19] Paragraph 316 states that "[a]s mentioned above, Defendant Detschelt also falsely stated that Mrs. Karabin suffers from Munchausen Syndrome."  The Court interprets that to refer to the allegation in paragraph 252 of the Complaint, which contains the specific statement that Mr. Detschelt is alleged to have made.

* * *

*Remember that screenshot of where you admitted you have a mental illness and acknowledge it? It was beautiful! I thought I was helping you make progress and then after two days of you not posting, I felt that we had made a breakthrough. But then you relapsed and now that we're close to the election, you're in total whackadoodle mode again.* But don't worry, Melissa, I have not given up. My 'oath' according to you says I need to take care of everyone and I'm not going to quit on you. We can do this, together! Like the politics of COVID, 'We're in this together', but unlike the union leadership and admin failing our kids during COVID, I will NOT fail you. Now let's try this again...deep breath and no posting on FB for two days and then we move on to three days. I have faith in you that you can do it!" (emphasis added).

* * *

Beverlee Kuch But it's you who laughs at EVERY post I and the other conservatives put out. If that's your coping strategy, then you are as whacky as Melissa Karabin. **I'll add you to the group therapy sessions of Melissa, Krista, and Lisa. As long as all of you do it online and don't disrupt the sane people of Norwin – I support that**.

* * *

Admitting it is the first step. Whoever is giving you advice on how to deal with your mental illness is giving you the wrong advice, Melissa. You living on FB and **cutting and pasting dissertation-length googled irrelevant nonsense** to support a position that doesn't exist in the real world **is like the guy who after the AA meeting goes to the bar across the street for a drink – it's self-defeating**. How is this supposed to help in addressing your issues?

* * *

And just when I thought you were starting to address your issues, thinking we had a breakthrough with you, here you go again with inventing laws that were broken. You state that I broke an oath of office? Which one? (I keep asking you this in all my replies and all I get is more cut and paste nonsense). The oath I took was: 'I do solemnly swear that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity.' **Supporting harm to children and taxpayers would go against my oath, but that's what the progressive democrat candidates would do if elected.**

* * *

Correct, that's why **crazy Melissa** shouldn't self-medicate by posting on FB.

\* \* \*

*Melissa Karabin's mental illness cannot be classified by medical professionals, so I do have sympathy for her going through life just being a Google copy-and-paste queen and making up laws to support her position. While I do feel that **liberalism is a mental disorder** (I have the shirt stating as such), I was always of the opinion that political beliefs in and of themselves never hurt anyone. But now, **you loonies** and your candidates are coming for our kids.*

\* \* \*

*The one about the padded room is my favorite. Melissa Karabin. I have a good laugh each time you repost my greatest hits. But how does promoting my posts that highlight your mental illness work in your favor? It's like discussing college drinking days with someone who just got out of AA. I told you before that I don't like to respond to you because I don't believe one should make fun of those with the severe mental illness of liberalism, TDS, or whatever undiagnosable issues you may have.*

\* \* \*

*I am eagerly expecting another copy and **paste faux ADA-themed woke thesis** to be emailed to the school board explaining why we're discriminating against you by not accommodating call ins to meetings or why FB posts, by yours truly, violate your rights. Our school legitimately violates the ADA every day by discriminating against vision- impaired students and the district doesn't care about that, so I can guarantee you that your deranged rants are given even less concern Since you're new to this group (of course, like all VOW plants who could care less about the original intent) you could do with some women friends? That's why I am honored to introduce you to **Melissa 'multiple personality' Karabin** and Loony Lisa Dupree. The three of you could hang out in Lisa's yard on top of Barnes Lake and stake her entire yard with more 'Hate Has No Home Here' and 'BLM' signs. If you could take these two off our hands and off FB, the Norwin community would be eternally grateful.*

\* \* \*

*I'm telling people that you, **Crazy Karabin**, and Black Jesus Brian should get together at the top of Barnes Lake Road and dance around putting more BLM signs into your lawn so that you can stay busy and off FB. If all the loonies were to hang out at your house, then they wouldn't be out in society. **Since the mental hospitals were shut down by the Democrats, I was just suggesting we should corral the crazies (and dangerous BLM supporters) at your place. Like an out of sight out of mind thing for the safety of Norwin.***

ECF No. 2 ¶¶ 315(c)–(o) (emphasis in Complaint).

The Court finds that these statements are incapable of being defamatory. Ms. Karabin claims that the references to her as being "crazy," having a "mental disorder," or otherwise calling into question her sanity are false statements of fact. ECF No. 31 at 4–5. But in context, these references appear to be insults and epithets, and largely refer to how Mr. Detschelt perceived people holding certain political positions and beliefs. As such, they are not actionable. *See Pacitti v. Durr*, No. CIV.A. 05-317, 2008 WL 793875, at *15 (W.D. Pa. Mar. 24, 2008) (Conti, J.), *aff'd*, 310 F. App'x 526 (3d Cir. 2009) (quoting *Kryeski v. Schott Glass Techn., Inc.*, 626 A.2d 595, 601 (Pa. Super. 1993)) ("[S]tatements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory."); *Slozer v. Slattery*, No. 2566 EDA 2014, 2015 WL 7282971, at *12 (Pa. Super. Nov. 18, 2015) (finding statements characterizing plaintiff as suffering from various mental illnesses not defamatory because "[r]ead in the context of the whole posting it is clear . . . that the import is that the political positions of Appellants are irrational in the view of the author because they are 'reminiscent' of conclusions and positions that would be generated by one with such mental traits."). Moreover, to the extent that Mr. Detschelt appears to be referencing an actual mental illness that Ms. Karabin has, she admits that she has "significant suicidal ideation, depression, [and] anxiety," ECF No. 2 ¶ 311, and the statements do not imply that she suffers from anything else.[20]

For all of the foregoing reasons, the Court will dismiss with prejudice the portions of Count I that allege that the statements in paragraphs 315(c)–(o) of the Complaint are defamatory.

---

[20] Mr. Detschelt's reference to Ms. Karabin as "Melissa 'multiple personality' Karabin," ECF No. 2 ¶ 315(n), appears to be nothing more than an insulting moniker, and the Court does not interpret it to imply that Ms. Karabin suffered from multiple personality disorder.

### 2.    The Court Will Dismiss the Portion of Count III That Seeks an Award of Monetary Damages

In Count III, Ms. Karabin alleges that Defendants retaliated against her in violation of Article I, § 7 of the Pennsylvania Constitution.  ECF No. 2 ¶¶ 343–350.  That section provides that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject."  PA. CONST. ART. I, § 7.  The substance of Count III is that the Defendants violated the Pennsylvania Constitution for the same reasons described in Count II:  they impermissibly retaliated against Ms. Karabin by excluding her from the District's March 2023 board meeting based on her viewpoint.  *See* ECF No. 2 ¶¶ 343–350.  Defendants argue that Count III should be dismissed because Ms. Karabin seeks an award of monetary damages and there is no private cause of action for damages under the Pennsylvania Constitution.  ECF Nos. 20 at 9–10, 28 at 10.  Ms. Karabin responds that the case law cited by Defendants did not involve Article I, § 7, and in any event, she has also asked for declaratory and injunctive relief, which is available for violations of the Pennsylvania Constitution.  ECF Nos. 26 at 10–13;  31 at 11–14.

The Court agrees with Defendants that Count III must be dismissed to the extent that Ms. Karabin seeks an award of monetary damages.  *See Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) ("No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution.");  *Shine v. Cnty. of Montgomery*, No. CV 23-1952, 2024 WL 3416257, at *11 (E.D. Pa. July 15, 2024), *appeal dismissed*, No. 24-2521, 2024 WL 5411565 (3d Cir. Sept. 5, 2024) (dismissing claims for monetary damages under Article I, § 7 of the Pennsylvania Constitution).  However, Ms. Karabin is correct that "equitable remedies are available" under the Pennsylvania Constitution.  *Pocono Mountain*, 442 F. App'x at 687 (citing *Jones v. City of Phila.*,

890 A.2d 1188, 1216 (Pa. Commw. 2006)).  Here, Ms. Karabin has sought not just monetary damages, but "such other and further relief as the nature of the case may require," ECF No. 2 ¶ 350, including an express request for a declaration that "Defendants violated the United States and Pennsylvania Constitutions by discriminating against Melissa Karabin in excluding her from a public forum and engaging in First Amendment/Pennsylvania Constitution free speech retaliation," *id.* ¶ 427.  Accordingly, the portion of Count III seeking equitable relief will be preserved.

For the foregoing reasons, the portion of Count III seeking monetary damages will be dismissed with prejudice.  The Court will not dismiss the portion of Count III seeking equitable relief.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motions to Dismiss will be **GRANTED IN PART** and **DENIED IN PART**, as set forth more fully in the accompanying Order.

DATED this 31st day of March, 2025.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record